UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JULIE A. SU, Acting Secretary of Labor,
United States Department of Labor,

    Petitioner,

v.

FORGE INDUSTRIAL STAFFING, INC.,

    Respondent.

_____/

Case No.: 1:23-mc-00066-PJG

Judge Phillip J. Green

**RESPONDENT FORGE INDUSTRIAL STAFFING, INC.'S RESPONSE TO PETITIONER SECRETARY OF LABOR'S PETITION TO ENFORCE ADMINISTRATIVE SUBPOENAS *DUCES TECUM***

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................................. ii

I.  INTRODUCTION ........................................................................................................1

II. FACTUAL BACKGROUND .......................................................................................3

    A.  BACKGROUND REGARDING FORGE'S BUSINESS AND OPERATIONS ...........................3

    B.  FORGE TAKES EXTENSIVE PRECAUTIONS TO AVOID EMPLOYING MINORS ...............3

    C.  THE FEBRUARY 25, 2023 NEW YORK TIMES ARTICLE .............................................4

    D.  FORGE FULLY COOPERATED WITH ALL STATE AND FEDERAL INVESTIGATORS ........................................................................................................................5

    E.  FORGE WORKED FOR SEVERAL MONTHS TO RESOLVE THE DEPARTMENT'S DISPUTED REQUEST FOR CLIENT INFORMATION .......................................................6

III. LAW AND ARGUMENT .............................................................................................9

    A.  RELEVANT LEGAL STANDARDS ................................................................................9

    B.  THE REQUESTED INFORMATION IS NOT RELEVANT TO THE INVESTIGATION .............9

    C.  THE DEPARTMENT HAS ACCESS TO THE REQUESTED INFORMATION ......................11

    D.  ENFORCING THE SUBPOENA WILL BE UNNECESSARILY BURDENSOME AND AN ABUSE OF PROCESS ................................................................................................12

IV. CONCLUSION ............................................................................................................14

# **INDEX OF AUTHORITIES**

**Cases**

*Adair v. Rose Law Firm*,
    867 F. Supp. 1111 (D.D.C. 1994) ................................................................................... 14

*Doe v. United States*,
    253 F.3d 256 (6th Cir. 2001) ..................................................................................... 9, 10

*E.E.O.C. v. Ford Motor Credit Co.*,
    26 F.3d 44 (6th Cir. 1994) ............................................................................................ 10

*E.E.O.C. v. Se. Food Servs. Co., LLC*,
    No. 3:16-MC-46-TAV-HBG, 2017 WL 2728422 (E.D. Tenn. June 23, 2017) ................ 10

*E.E.O.C. v. United Air Lines, Inc.*,
    287 F.3d 643 (7th Cir. 2002) ........................................................................................ 10

*E.E.O.C. v. Wal-Mart Stores East, LP,*
    2016 WL 1242540 (E.D. Ky. Mar. 29, 2016) ................................................................ 12

*F.D.I.C. v. Garner*,
    126 F.3d 1138 (9th Cir. 1997) ...................................................................................... 12

*F.T.C. v. Owens–Corning Fiberglas Corp.*,
    626 F.2d 966 (D.C. Cir. 1980) ...................................................................................... 13

*F.T.C. v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1997) ...................................................................................... 13

*In re Civil Investigative Demand 15-439*,
    2016 WL 4275853 (W.D. Va. Aug. 12, 2016) ............................................................... 12

*N.L.R.B. v. Am. Med. Response, Inc.*,
    438 F.3d 188 (2d Cir. 2006) ............................................................................................ 9

*United States v. Exxon Corp.*,
    628 F.2d 70 (D.C. Cir. 1980) ........................................................................................ 13

*United States v. Palmer*,
    536 F.2d 1278 (9th Cir. 1976) ...................................................................................... 10

**I.      INTRODUCTION**

The Department mischaracterizes the nature of this matter, claiming that it involves the question of whether a company being investigated for compliance with the Fair Labor Standards Act ("FLSA") "has the authority to limit the investigation as it sees fit." Respondent, Forge Industrial Staffing, Inc. ("Forge"), is not seeking to limit the Department's investigation, but is rather requesting that the Department conduct its investigation in a manner that does not materially harm Forge's business or drive Forge out of business altogether. That is not hyperbole. Forge has already suffered substantial harm, and it is desperate to avoid further, fatal harm to its operations. For that reason, outside of the information at issue here, Forge has produced every single document that has been requested and done everything else in its power to cooperate with the Department, all in an effort to avoid this very dispute.

The Department's Petition involves a single, disputed request: the identification of each and every one of Forge's approximately 600 clients at its twelve business locations across Michigan and Indiana, along with Forge's contracts with those clients. The Department asserts that this request is nothing more than a matter of purported efficiency. But Forge has already provided the Department with the name and contact information for <u>every single person who has worked for Forge for the past three years</u>. Forge has also offered – and remains willing – to produce any of its employees for interviews by the Department at Forge's offices, at Forge's time and expense. In an effort to resolve this dispute, Forge did just that, and a Department investigator met with and interviewed a group of Forge employees that the Department selected. However, the Department thinks it will be easier if it can show up at Forge's customer locations, announce that it is investigating child labor violations involving Forge employees, and interview workers. Forge is asking that the Court balance and weigh the Department's purported efficiency claim against the material, substantial harm that Forge will incur.

This harm is not hypothetical.  Forge has already lost multiple clients and millions of dollars in revenue because of the Department's investigation.  If Forge is tarred with the brush of a child labor law investigation, more clients will cut their ties and terminate their contracts.  And if the Department subsequently determines that there have been no violations, as Forge believes will be the case, it will be too late.  The damage will have already been done.  Moreover, these third-party clients, who are not under investigation, could themselves suffer substantial harm by way of the publicity surrounding such interviews.

At this point, the Court may be wondering why Forge has not discussed why it is being investigated.  The reason is simple: Forge has no idea.  Here is what Forge does know.  On February 25, 2023, the New York Times published an expansive article addressing claimed violations of child labor laws involving numerous employers in twenty different states.  The article quotes a former Forge employee, Nubia Malacara, as indicating that one of Forge's clients, Hearthside Foods, was knowingly employing minors.  Ms. Malacara does not make any statements regarding Forge in the article.  In the days and weeks following the publication of that article, Forge has been under the spotlight of numerous state and federal agencies.

The past nine months of intensive, exhaustive investigations have not resulted in a single claimed violation against Forge.  Certainly, if any state or federal agency believed it had any evidence that Forge was wrongfully employing minors, swift action would have been taken.  There is a reason that no violations have been claimed, and that no other state or federal agency has filed a subpoena enforcement action.  Forge takes extensive efforts to comply with the law and it has cooperated with all investigators – including the Department – because Forge wants to be the first to know if it has any problems that need to be addressed.

In sum, based on an article from last February that quoted *one* former Forge employee in *one* of Forge's offices involving *one* of Forge's clients, the Department seeks the identification of every single client from every single Forge location in two different states, based on <u>no claimed violations</u> and nothing more than the stated purpose of determining *whether* Forge is complying with the FLSA. Under these circumstances, the requested material is not relevant, the Department already has the means to determine joint-employer information for any particular worker, and the scope and purpose of the requested information is unduly broad and overly burdensome to Forge. For these reasons, Forge respectfully requests that the Court deny the Department's Petition.

## II.     FACTUAL BACKGROUND

### A.     BACKGROUND REGARDING FORGE'S BUSINESS AND OPERATIONS

Forge is a temporary staffing agency, connecting businesses and workers for temporary or contract work. The company was founded in 1995 by its two individual owners. *See* Declaration of Brian Oele, **Exhibit A,** at ¶ 2. Through its focus on relationships, with both clients and workers, Forge has built a reputation as a trusted business partner for industrial manufacturers and as a highly regarded employer among job candidates. The company now operates twelve offices across Michigan and Indiana. *Id*. at ¶ 3-4.

### B.     FORGE TAKES EXTENSIVE PRECAUTIONS TO AVOID EMPLOYING MINORS

Employers like Forge must deal with the reality that underage workers will provide false information and present falsified documents in an effort to gain employment, and that bad actors are growing more sophisticated. Faced with that reality, Forge invests significant time and effort to avoid inadvertently employing underage workers. In its 28-year history, Forge has never even been accused of a child labor law violation. *See* Ex. A at ¶ 5. Under no circumstances would Forge ever knowingly place a child under the age of 18 with one of its clients. *Id.* at ¶ 6.

Forge has multiple safeguards in place in its application, interview, and onboarding processes to confirm that applicants are at least 18 years old. *Id.* Forge's staff is continuously trained regarding Forge's policies and identity verification practices, and staff members are periodically tested, including by "mystery shoppers," paid "applicants" who intentionally attempt to get hired while being out of compliance with Forge policies. *Id.* at ¶ 7-9. Forge also periodically engages outside counsel to audit its policies and procedures. *Id.* at ¶ 9.

C. **THE FEBRUARY 25, 2023 NEW YORK TIMES ARTICLE**

On February 25, 2023, the New York Times published an expansive article on child labor violations, which it claimed was the result of a 20-state investigation involving interviews with over 100 migrant child workers.[1] Included in the article is a reference to three under-age workers who allegedly worked at one of Forge's clients, Hearthside Food Solutions ("Hearthside") in the last year. One of Forge's former employees, Nubia Malacara, is quoted in the article as stating that she worked at Hearthside as a minor, and that "Hearthside didn't care" that it was "getting young-looking workers whose identities had been flagged as false." There are no statements or assertions in the article that Forge knowingly placed minors at Hearthside or that Forge otherwise violated any laws. *See id.* In response to the article, Forge retained outside counsel and immediately undertook an extensive internal investigation to determine whether any of its supervisors or administrative staff were either intentionally placing minors with clients or otherwise failing to comply with company policies. *See* Ex. A at ¶ 11. Forge found no evidence that either of those issues were occurring. *Id.* at ¶ 12.

---

[1] *See* https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers exploitation.html.

Forge also reviewed its employment records for information related to Ms. Malacara, and it found information for Ms. Malacara in two different databases, representing two distinct types and periods of employment with the company. Ms. Malacara first worked for Forge twelve years ago as a temporary worker in Grand Rapids for *three days* in 2011. *Id.* at ¶ 13, 15-16. Ms. Malacara reported a date of birth of November 10, 1992 in her application materials, which would have made her 19 at the time. *Id.* at ¶ 16. This would have been the only time that Ms. Malacara worked at Hearthside, despite the New York Times article seemingly referencing employment within the past year, a false assertion.

Ms. Malacara was hired again by Forge ten years later, in August 2021, as a Service Coordinator, a full-time administrative position with Forge that involved her recruiting and screening potential candidates for placement with Forge clients. After working for less than a year, Ms. Malacara voluntarily resigned without notice in July 2022. *Id.* at ¶ 17. Forge later determined that Ms. Malacara deleted all of her company e-mail folders before she resigned. *Id.* at ¶ 21. Significantly, Forge has no record of Ms. Malacara ever reporting any issues with child labor violations or concerns while working for Forge. *Id.* at ¶ 20. It is also significant to note that Ms. Malacara listed a different date of birth, November 10, 1995, in her second application with Forge, and applied with social security number different than the one she used ten years prior. *Id.* at ¶ 22.

**D.    FORGE FULLY COOPERATED WITH ALL STATE AND FEDERAL INVESTIGATORS**

Forge was investigated by multiple state and federal agencies in the aftermath of the article. With the sole exception of the client information at issue in this case, Forge has fully responded to every request for information from every agency, has not had any disputes with any agency, and has not been accused of any violations of law by any of the investigators.

Forge first received contact from the Michigan Department of Labor and Economic Opportunity ("LEO"). Forge produced voluminous information to the LEO, including a list of current and former employees who were employed with Forge and placed at Hearthside for the period of February 27, 2022 to present. *See* Ex. A at ¶ 23. Forge also received Notices of Inspection from the U.S. Department of Homeland Security ("DHS"), related to Forge's Grand Rapids offices. Forge fully complied with all of the requests, which again included a voluminous production of information and documents related to current and former workers.

In addition, Forge also received subpoena requests from the Department, which were much more expansive than the requests from the other agencies. *See* **Exhibit B**. The twenty-six categories of requested information included expansive requests for general corporate information. Moreover, unlike other agency requests, the Department's subpoena requests were not limited to workers in Grand Rapids or those placed at Hearthside. Rather, the Department requested extensive records <u>for all current and former workers at every Forge location in Michigan and Indiana for the past three years</u>. With the exception of the client information at issue in this case, Forge produced all responsive information. Specifically, Forge made two separate productions to the Department, in March and May 2023, which together involved over 60,000 pages of material and the production of native spreadsheets with tens of thousands of lines of information related to Forge's workers.

### E. FORGE WORKED FOR SEVERAL MONTHS TO RESOLVE THE DEPARTMENT'S DISPUTED REQUEST FOR CLIENT INFORMATION

From the very beginning, counsel for Forge explained Forge's belief that producing client information would cause significant, and perhaps fatal, damage to the company. *See* Declaration of Brion Doyle, **Exhibit C**, at ¶ 2. As counsel for Forge explained to the Department, all of Forge's client contracts are terminable at will upon a short period of notice. *See* Ex. A at ¶ 26. Moreover,

6

Forge has multiple competitors. *Id.* at ¶ 27. Thus, all of Forge's clients have the right to terminate their contracts with Forge, with ready access to many other staffing agencies. *Id.* at ¶ 28.

Forge has already experienced devastating losses related to the article and investigation, having lost 17 clients, representing approximately $9.5 million in annual revenue, with multiple clients indicating that they were terminating or scaling back business in direct response to the article and resulting investigation. *Id.* at ¶ 29. Forge also lost eight potential clients who either intimated that they could no longer move forward with Forge due to the article and investigation or simply broke off contact at that time. *Id.* at ¶ 30. These losses have resulted in layoffs at Forge, and Forge's overall revenue with its existing clients is down approximately 40%, much more so than industry trends would dictate. *Id.* As of last month, Forge is struggling to break even.

Forge has already suffered devastating harm, and additional client losses will put the company out of business. For these reasons, <u>Forge has worked extensively to reach a compromise with the Department on this issue</u>. For months before this litigation was initiated, counsel for Forge engaged in discussions and proposed to Rina Russo, a Department investigator, that Forge could make workers available for interviews at Forge's offices. *See* Ex. C at ¶ 4. While the Department was ostensibly considering that offer, they filed this Petition, to Forge's surprise and disappointment. Counsel for Forge immediately made contact with the Department's attorney, picking up the conversation about a resolution from where it had been dropped by Ms. Russo. *Id.* at ¶ 5.

First, counsel for Forge proposed a tolling agreement on any claims by the Department, and the parties entered into such an agreement, setting a tolling period from August 15, 2023 through February 15, 2024. *See* Tolling Agreement, **Exhibit D**. Counsel for Forge then continued to propose the alternative approach that Forge would provide its workers for interviews at Forge's

7

offices. As counsel for Forge explained, if Department personnel show up on job sites, they have no guarantees that any workers will talk to investigators. *See* Ex. C at ¶ 6. In contrast, Forge indicated that it was willing to pay workers and encourage and coordinate their participation, guaranteeing a much higher likelihood of participation. Counsel for Forge also indicated that the Department should select the workers it wanted to interview and would have unfettered access to workers at Forge's offices. *Id.* at ¶ 7.

The Department agreed to Forge's proposal, and, on August 8, 2023, the parties notified the Court of their agreement on a proposed interim measure. *See* ECF No. 9, PageID.70. On September 19, 2023, counsel for the Department provided Forge with its initial list of requested employees for interviews. Forge immediately took steps to coordinate the interviews, informing the selected employees that they should participate, should speak freely, would face no adverse employment consequences, and would be paid double time for participating. *See* Ex. A at ¶ 33.

At the end of the first round of Department interviews on September 28, a Forge representative reminded the Department investigator that additional interviews had been scheduled for the following day, to which the investigator responded "I think we are good, don't you?" The Forge representative responded that it was completely up to the Department, at which point the investigator referenced the looming government shutdown and said that Forge could cancel the remaining interviews and that the workers could call her if they wanted to do so. *Id.* at ¶ 36.

On October 5, 2023, counsel for the Department contacted counsel for Forge with a proposal to resolve this matter, indicating that the Department "<u>would be willing to resolve the subpoena enforcement action/forego the contractor information</u>" if Forge agreed to produce a package of employment documents for each employee, <u>relinquishing its request for the client information</u>. *See* October 5, 2023 E-mail, attached as **Exhibit E** (emphasis added). However,

8

even as Forge was preparing materials to respond to this request and resolve this matter, counsel for the Department wrote six days later to indicate that the Department was no longer willing to consider any compromise to resolve the subpoena dispute.  *See* October 11, 2023 E-mail, attached as **Exhibit F**.  Counsel for Forge reached out to counsel for the Department to seek an explanation for this abrupt change in course, and none was given, other than vague references to the political nature of child labor issues.

### III.  LAW AND ARGUMENT

#### A.  RELEVANT LEGAL STANDARDS

An administrative subpoena "is properly enforced if (1) it satisfies the terms of its authorizing statute, (2) the documents requested were relevant to the [agency]'s investigation, (3) the information sought is not already in the [agency]'s possession, and (4) enforcing the subpoena will not constitute an abuse of the court's process." *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001).  Even if the agency satisfies its initial burden on the first three points above, a subpoena will not be enforced if the party opposing enforcement "demonstrates that the subpoena is unreasonable, or issued in bad faith or for other improper purposes, or that compliance would be 'unnecessarily burdensome.'"  *N.L.R.B. v. Am. Med. Response, Inc.*, 438 F.3d 188, 192–93 (2d Cir. 2006).

#### B.  THE REQUESTED INFORMATION IS NOT RELEVANT TO THE INVESTIGATION

The Department argues that because it has "opened an investigation of Forge to determine the company's compliance with the FLSA," it has the unfettered right to any and all information that could potentially relate to compliance, including the identity and contracts with each and every one of Forge's clients, in every office and state in which the company does business.  But that argument is circular, and it makes the showing of relevancy a nullity.  Under the Department's theory, any record tangentially related to a company's employees or employment practices would

automatically be relevant, without exception, without any suspicion of a violation, and just because the Department "wants assurances" that the FLSA is not being violated. Such an argument is not consistent with the law and is not supported by the authority in the Department's briefing.

"Although relevance is viewed broadly, the court does not have to simply accept the agency's opinion as to what is or is not relevant to the investigation. Instead, the court should weigh the likely relevance of the requested material to the investigation against the burden of producing the material." *Doe v. United States*, 253 F.3d 256, 267 (6th Cir. 2001). Thus, "a proper subpoena is sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *United States v. Palmer*, 536 F.2d 1278, 1282 (9th Cir. 1976). Courts routinely limit or strike agency investigatory subpoenas based on arguments of relevancy that are much more specific and expansive than what has been presented in this case.[2]

Here, the Department gives nothing more than the unsupported opinion that the requested information is relevant to a general FLSA "compliance" investigation, and the Department has not provided any information about the nature of that investigation to assist the Court in determining relevancy. The Department does not contend that it has suspicions of violations at any particular Forge location, or that it has uncovered any violations at all after several months of investigations. Likewise, the Department does not explain why it needs client information from all Forge locations, or why a concern at one of Forge's independent branches (no concern has been identified) would implicate concerns at others. Again, the argument here that "we get everything

---

[2] *Cf. E.E.O.C. v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994); *E.E.O.C. v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002); *E.E.O.C. v. Se. Food Servs. Co., LLC*, No. 3:16-MC-46-TAV-HBG, 2017 WL 2728422, at *4 (E.D. Tenn. June 23, 2017).

10

so we can see whether there might be a violation" is not just contrary to the relevancy standard – it would destroy that standard altogether.

Moreover, the case law presented by the Department does not support a standard of relevancy under which the Department's pronouncement that it is generally investigating a company for compliance with the FLSA opens the floodgates to any and all information related to employees and employment, across a company's entire business enterprise. To the contrary, and as is summarized on the chart attached as **Exhibit G**, the case law in the Department's briefing involves (1) much more targeted investigations, <u>allowing the courts to evaluate the claimed relevancy of the requests</u>; (2) outright refusals to produce documents and to reach any accommodation with the Department; and (3) instances in which the courts limit the scope of the requests even under those circumstances. The Department does not present a single case in which it has been authorized to obtain all of a company's employment–related records (let alone client records) across all operations based merely on a general desire to determine whether a company is complying with the FLSA.

Here, the Department does not articulate why any particular client identification is relevant to its investigation, nor does it articulate why the identity of all clients is relevant. Instead, the Department argues that it needs the client information so it can conduct on-site interviews. <u>That is not a demonstration of relevancy, but the expression of an investigative preference: the Department desires to interview workers at one location as opposed to another</u>.

### C. THE DEPARTMENT HAS ACCESS TO THE REQUESTED INFORMATION

The Department has had contact information for Forge's employees for more than six months, and the ability to interview any and all of those workers. The Department has also therefore had the ability to ask questions to determine joint-employer status in connection with any work assignment. To Forge's knowledge, the only interviews the Department has conducted

11

to date are of those workers that Forge made available at the Department's request. Regardless, the Department has access to the information being sought, and it does not need the identification of, and contracts with, Forge's clients.

"Concerns as to duplicative production," and the government "seeking information already within its possession threaten an undue burden upon the subpoenaed party." *In re Civil Investigative Demand 15-439*, 2016 WL 4275853 at *7–8 (W.D. Va. Aug. 12, 2016). Here, the Department's request is based solely on the Department's preference as to where worker interviews occur. The Department apparently does not want to contact workers directly to set up interviews or to have Forge set up the interviews; it wants to conduct the interviews at Forge's client locations. This is not a matter of the Department not having the means or information to interview workers, or to determine joint-employer status when it does interview workers. The Department already has the ability to interview workers and determine joint-employer status, which is why it cannot satisfy this standard.

        **D.**    **ENFORCING THE SUBPOENA WILL BE UNNECESSARILY BURDENSOME AND AN ABUSE OF PROCESS**

Finally, even if the Department could meet its initial burden, the Petition should still be denied, as the requested information is unduly burdensome and an abuse of process. In evaluating this standard, the Court is tasked with "weigh[ing] the likely relevance of the requested material to the investigation against the burden to [respondent] of producing the material." *E.E.O.C. v. Wal-Mart Stores East, LP,* 2016 WL 1242540 (E.D. Ky. Mar. 29, 2016). Put another way, "[a]n administrative subpoena thus may not be so broad as to be in the nature of a 'fishing expedition.'" *F.D.I.C. v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997).

Forge requests that the Court weigh the Department's request, which boils down to a preference as to where it conducts interviews, against the disruption and harm to Forge's business

12

and to the business operations of numerous third-party businesses who are not implicated in this investigation in any way.  Simply put, on-site interviews will destroy what is left of Forge's business, which is down 40% year to date and has already experienced multiple lost clients just by being associated with this investigation.  Moreover, it is not at all speculative to anticipate the substantial harm that would result to any of Forge's clients who are publicly implicated in a "child labor" investigation, which is exactly what would happen if the Department conducts interviews at client locations.

The Court should also weigh the fact that the Department was willing to resolve this issue without any client information – but withdrew the request before Forge could comply.  The fact that the Department itself concluded in writing that it could move forward without the client information is not indicative of a good-faith need for the information and must tip the scale in favor of Forge.  The Department did a complete about-face in six days, with no intervening changes and based on no claimed violations, without any regard for the harm that Forge will incur.  This is an abuse of process.

Finally, and at minimum, Forge requests that the Court restrict the Department from conducting interviews on site at Forge's clients' locations.  "Since the enforcement of a subpoena is an independent judicial action . . . a court is free to change the terms of an agency subpoena as it sees fit." *United States v. Exxon Corp.,* 628 F.2d 70, 77 (D.C. Cir. 1980).  *See also F.T.C. v. Owens–Corning Fiberglas Corp.*, 626 F.2d 966, 973–74 (D.C. Cir. 1980).; *United States v. Exxon Corp.,* 628 F.2d at 77; *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C. Cir. 1997).  "It is a legitimate exercise of the court's authority to modify the terms of an agency subpoena by providing additional confidentiality protections for a person or entity to whom the subpoena is directed, and particularly for innocent third parties about whom the respondent that is the subject of subpoena may possess

13

information." *Adair v. Rose Law Firm*, 867 F. Supp. 1111, 1115 (D.D.C. 1994). To avoid harm to Forge and to its clients, the Department should be precluded from interviewing Forge workers on site at client locations given the adequate alternate means of obtaining those interviews.

## IV.    CONCLUSION

Based on the foregoing, Forge respectfully requests that the Court deny the Department's Petition or, alternatively, enter an appropriate protective order that limits both the scope and use of the requested information.

Respectfully Submitted,

VARNUM LLP
Attorneys for Respondent

Dated: November 14, 2023         By:     */s/ Brion B. Doyle*
                                         Brion B. Doyle (P67870)
                                         VARNUM LLP
                                         Bridgewater Place, P.O. Box 352
                                         Grand Rapids, MI 49501-0352
                                         (616) 336-6000
                                         bbdoyle@varnumlaw.com

21987418.2